Exhibit "1"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERLENE BACCHUS,<br><br>          Plaintiff,<br><br>-against-<br><br>THE CITY OF NEW YORK, RENÉE PEPPER and BOARD OF EDUCATION EMPLOYEES LOCAL 372, DISTRICT COUNCIL 37, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO,<br><br>          Defendants. | Case No.: 12-cv- 1663 (PKC)(MDG)<br><br>**PLAINTIFF'S AFFIDAVIT IN OPPOSITION TO DEFENDANTS' RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT** |

**STATE OF NEW YORK** )
                       :
**COUNTY OF KINGS** )

     **MERLENE BACCHUS**, being duly sworn, deposes and says:

    1. I am the plaintiff in the above entitled action, as such I am fully familiar with all the facts and circumstances herein. I have personal knowledge of the facts contained herein.

    2. I make this affidavit in opposition to the motions for summary judgment served by Defendants New York City Department of Education ("DOE") and Renée Pepper, and by Board of Education Employees Local 372, District Council 37 and American Federation of State, County and Municipal Employees, AFL-CIO ("Unions").

    3. This affidavit is submitted further to, and in addition to the testimony I provided at my deposition in this case on May 21, 2013, and August 14, 2013 and my affidavit of April 25, 2014, submitted in support of my motion for partial summary judgment against the Unions.

4. Throughout the duration of my employment with the DOE, my work performance was consistently excellent. In recognition of my excellent work performance, hard work and dedication to the DOE, I was awarded numerous Certificates of Achievement, Appreciation and/or commendations.

5. Despite my excellent work performance, in December 2009, Ms. Pepper, Angela Thompson, now deceased, Ms. O'Connell and other at PS/IS 295Q ("PS 295") staff members falsely alleged that I subjected approximately six (6) fourth grade students to corporal punishment or verbal abuse while supervising them at the School yard or Gymnasium. The PS 295 School Yard where most of the alleged corporal punishment or verbal abuse allegedly took place was equipped with surveillance cameras but Ms. Thompson and Ms. Pepper refused to give me and my union representative access to view the surveillance video footage for the dates and times in question nor did they obtain witness statement from any of my co-workers who were always present whenever we supervised students at the School Yard.

6. As a result of said false allegations and other incidents of hostile work environment which I was being subjected to, on or about December 14, 2009, I met with Superintendent Lennon Murray (then Superintendent for DOE's School District 29) at his offices and complained to him that Ms. Pepper and Angela Thompson, now deceased, were subjecting me to harassment, hostile work environment and discrimination on the basis of my race and national origin. At the aforesaid meeting, I informed Superintendent Murray, among other things:

    a. That Ms. Pepper required me -- over a period of more than two weeks -- to lift numerous heavy boxes filled with books onto a flatbed cart borrowed from the

2

school's custodian and push the cart to the first, third and fourth floors to distribute the books even though my job description did not include such task and that I was the only School Aide who was made to perform such task (other school aides were allowed to open the boxes, take a few books at a time which they pushed on the small office trolley – not a flatbed cart);

b. That Ms. Pepper required me to be solely responsible for making all photocopying at PS 295. (Pepper made me stand-up at the copy machine for about three hours a day for over a period of four months making photocopies for the entire school even when all the other School Aides were idle. School Aides at PS 295 regarded photocopying as an undesirable assignment because it usually entailed standing up for several hours.);

c. That Ms. Pepper, Thompson and other staff members procured numerous false charges of corporal punishment or verbal abuse of students against me, would constantly yell or scream at me, speak to me harshly in a loud tone of voice, assign excessive work load to me and that I was subjected to unjustified medical examination;

d. That Ms. Thompson directed me not to make any contact with students and began to assign only me to perform office duties -- which duties were detested and considered undesirable by all School Aides; and

e. That I believed that the false charges of corporal punishment or verbal abuse were being procured against me so that Ms. Pepper and the school Administration would

3

have a reason to terminate my employment so that they can replace me with Katarzyna Lopez, a Caucasian female of Polish national origin who was a less senior School Aide to me.

7. At the aforesaid meeting with Superintendent Murray, I also provided him with a copy of my letter dated December 14, 2009 (a copy of which is Bates-stamped 048-050 and attached to the complaint I submitted on December 16, 2009 to DOE's Office of Equal Opportunity ("OEO")).

8. On or about December 16, 2009, I filed a discrimination complaint with the OEO by which I complained that I was being subjected to a hostile work environment and discrimination on the basis of color, race ethnicity and national origin.

9. During my employment at PS 295, I was the only West Indian woman employed as a School Aide at the school. My co-worker, Parbatie "Donna" Arjoon, is a non-West Indian. She is an Indian woman and does not speak with a West Indian accent. Ms. Pria Bala, who was employed at PS 295 as a Parent Coordinator, is also an Indian woman. Both Ms. Bala and Ms. Arjoon speak with the similar Indian accent and both of them also have the similar physical characteristics or features. Also, although Ms. Thompson was a Black woman, she was a non-West Indian.

10. In December 2009, a few days after I filed my OEO complaint, Ms. Pepper walked into the copy room where I was making copies with an angry demeanor on her face and stared at me steadily before stating in an angry harsh tone of voice: "Merlene," you filed a complaint with the OEO and that the complaint would not do me any good as I would still have to go to the basement to lift and unpack boxes.

4

11. Prior to the filing of my OEO discrimination complaint, Ms. Pepper would regularly come to the office where all the School Aides were and would ask only me "Merlene, what are you doing?" She would follow me into the hallway whenever I stepped out of the office. After Ms. Pepper confronted me in the basement about my OEO complaint, she continued discriminate against me and began to retaliate against me for filing the OEO complaint, by intensifying the hostile and discriminatory conduct she was subjecting me to. Specifically:

a. Ms. Pepper criticized and shouted at me to the hearing of everybody present for everything I did even though other School Aides would be doing the same thing at the same time. She followed me every time I went to the bathroom and instructed me that each time I needed a bathroom break I had to seek out a School Safety Agent ("SSA") and ask the SSA to call her (Ms. Pepper) on her radio to request permission. So Ms. Pepper knew when I went to the bathroom and would follow me to the bathroom and stated that I was going to the bathroom too often, therefore that I should not go to the bathroom except during my lunch break or when I was off the clock.

b. On January 6, 2010, Ms. Pepper followed me to the bathroom and later procured a false charge against me for alleged use of inappropriate language in the office. Ms. Pepper performed a false investigation into the charge, procured Ms. Colleen O'Connell, Guidance Counselor, to bear false witness about the charge even though Ms. O'Connell was not present when the alleged incident happened and falsely substantiated the charge.

5

c. On or about January 7, 2010, I received a letter from Ms. Thompson notifying me about a disciplinary conference scheduled for January 15, 2010, in connection with a false allegation of corporal punishment/verbal abuse by a student. Apparently, Ms. Pepper and Ms. O'Connell coerced or manipulated a student known as ES to falsely allege that on December 1, 2009, I pulled her (ES) by her hair in the lunchroom. This allegation was falsely investigated by Ms. Pepper and Ms. O'Connell, allegedly substantiated and I was suspended for two weeks without pay from February 23, 2010 through March 9, 2010.

e On or about February 2, 2010, the school Administration substantiated all the six false allegations of corporal punishment/verbal abuse of students that allegedly occurred from November 2009 through December 3, 2009 -- the same time period of Ms. Lopez's lay-off.

12. On or about March 3, 2010, I filed a complaint of discrimination with the New York State Division of Human Rights ("NYSDHR"). Following the filing of my NYSDHR discrimination complaint, Pepper and the Administration continued to discriminate against me and further retaliate against me by increasing the intensity of their discriminatory and retaliatory conduct. Specifically:

a. In April, 2010, Ms. Pepper brought three additional charges against me for alleged improper use of handbag and umbrella and for alleged failure to properly supervise students and report an incident to Ms. Pepper. Other School Aides always had their pocketbooks and occasionally carried an umbrella while supervising students but no other School Aide was either reprimanded or disciplined for having a pocketbook or

an umbrella while supervising students. Also, my conduct in supervising the students in question complied with the School policy and practice and did not warrant any reprimand. The charges were falsely substantiated and disciplinary letters placed in my personnel file;

b. My already excessive work load was also drastically increased in retaliation for my NYSDHR complaint. I was made to supervise two classes each lunch period whereas every other School Aide supervised only one class each. Also, because younger students were more difficult to control, other School Aides preferred not to supervise younger students. However, I was made to supervise younger students and classes that had largest number of students. Further I continued to be solely responsible for making all photocopies which entailed my having to stand up for extended periods of time to copy handouts or books for all classes.

c. Pepper continued to berate and speak to me in a harsh tone of voice whenever she spoke to me. During the months of April, May and June 2010, Ms. Pepper regularly stated to me that she could tell from my "body language" that I did not want to work at PS 295. Each week Ms. Pepper gave me a printout of vacant postings for school aide positions in other schools and asked me to apply for such positions stating she could help me find a position elsewhere.

d. Following my NYSDHR complaint, whenever I left the main office, I informed Ms. Barbara Levy (White female, then PS 295 Secretary/Office Manager), where I was going to but Ms. Pepper would always call me on the public address system stating,

7

"Bacchus report to the AP's office immediately!" Each time I reported to Ms. Pepper's office in response to her call, she spoke to me harshly and asked in an angry tone of voice, "where did you go?", "who gave you permission to leave?, or "why did it take you so long to use the bathroom?" Ms. Pepper did not subject any non-West Indian School Aide to such verbal abuse, close scrutiny or monitoring.

13. At the times I filed the discrimination complaints with the OEO and NYSDHR, I believed that Pepper, Thompson and other individuals at PS 295 were discriminating against me on the basis of my race, color, ethnicity and/or national origin. Such belief was predicated on the fact that Ms. Thompson, Ms. Pepper, Ms. Levy and Ms. LaBella each frequently mimicked my West Indian accent, imitated how I speak and made other derogatory remarks or insulting comments about my West Indian or Guyanese national origin. Such belief was also predicated on the fact that I was the only School Aide of West Indian national origin at PS 295 and was being treated differently and subjected to different and more onerous terms and conditions of employment than the other School Aides – all of whom were of non-West Indian national origin. Such belief was further based on the fact that I am a West Indian woman and that Ms. Pepper, Ms. Thompson, Ms. O'Connell and Ms. Levy sought to wrongfully terminate my employment in order to recall Ms. Lopez, a White female of Polish national origin.

14. Also, on or about May 18, 2010, I submitted a rebuttal dated the same date (Bates numbered 069-072) to NYSDHR in response to the position statement the DOE submitted to NYSDHR in connection with my discrimination complaint.

8

15. During 2009 through January 2011, I frequently overheard Ms. Thompson state that she did not like West Indian women, that West Indian women were stupid and cannot speak English language. Also, Ms. Thompson, Ms. Pepper, Ms. Levy and Ms. LaBella each frequently mimicked my West Indian accent.

16. On several occasions in the Spring and fall of 2010 while speaking to Ms. Thompson she cut me off and made various remarks like: "Merlene, what are you saying. You sound like you're saying blah blah blah. Why can't you West Indian women learn to speak the English language properly? Learn to speak the English language." Ms. Thompson frequently corrected my pronunciation of certain words, such as "schedule", "preference" or "advertisement", in front of staff members and visitors.

17. Whenever Ms. LaBella passed by me in the hallway, or entering or exiting the bathroom, or when we met in the lunchroom (sometimes she would be in company of O'Connell, Levy or Ms. Chauzzi), she made insulting comments about me such as "I hope she didn't blow it up" or "don't blow it up please" or "look at the mad old lady" and called me "Aunt Jemima" or "ugly monkey" while making animal sounds.

18. Several of the disciplinary letters issued to me by Ms. Thompson recommended that I "utilize the Personal Service Unit of [my] union to receive further training in proper business conduct." However, Phyllis Wambser, my union representative told me that the Unions did not have any Personal Service Unit for training of School Aides. Also, Ms. Thompson never asked me whether or not I had utilized any Personal Service Unit or if I attended any further training.

9

19. Furthermore, I was allowed to work with the same 601 students, including but not limited to AA, KR and JM up until March 11, 2011, when my employment was terminated.

20. The "fat boy" false allegation for which I was allegedly discharged was falsely procured by Ms. Pepper, allegedly investigated by Ms. Pepper and allegedly substantiated by Ms. Pepper.

21. Ms. Thompson was not present at PS 295 premises on February 2, 2011 when the alleged "fat boy" incident allegedly occurred, nor on February 3, 2011 when said incident was reported to the DOE Office of Special Investigations, nor on February 16, 2011 when Pepper held an alleged Disciplinary Conference on the "fat boy" allegation.

22. I remember very clearly that Ms. Thompson was not present on the premises of PS 295 on February 3 and 16, 2009, because in the course of the Disciplinary Conferences held on those dates by Ms. Pepper, she (Ms. Pepper) explained to Ms. Wambser and I on each date, that Ms. Thompson was out sick.

*Merlene Bacchus*

Merlene Bacchus

Sworn to before me this
29th day of July, 2014

VINCENT I. EKE-NWEKE
Notary Public, State of New York
Qualified in Kings County
No. 02EK6050664
My Comm. Expires 04-15- 2018

10

VINCENT I. EKE-NWEKE
Notary Public, State of New York
Qualified in Kings County
No. 02EK6050664
My Comm. Expires 04-15- 2018