UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MERLENE BACCHUS,

           Plaintiff,

      -against-

THE CITY OF NEW YORK, RENÉE
PEPPER and BOARD OF EDUCATION
EMPLOYEES LOCAL 372, DISTRICT
COUNCIL 37, AMERICAN FEDERATION
OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO,

           Defendants.

Case No.: 12-cv- 1663 (PKC)(MDG)

**PLAINTIFF'S STATEMENT OF
UNDISPUTED MATERIAL
FACTS PURSUANT TO RULE
56.1**

Plaintiff Merlene Bacchus ("Plaintiff" or "Bacchus"), pursuant to Local Civil Rule 56.1

submits this Statement of Undisputed Material Facts ("Plaintiff's Statement"), in support of her

motion for an Order, pursuant to Fed. R. Civ. P. 56 granting partial summary judgment in her favor

as against defendants Board of Education Employees Local 372, District Council 37, American

Federation of State, County and Municipal Employees, AFL-CIO ("Unions"). Bacchus concedes,

solely for the purposes of this motion, that Plaintiff's Statements, as set forth herein, are undisputed.

### A.    Bacchus' Background And Relevant Employment History

1.      Bacchus is a Black female, born in Georgetown Guyana, South America, one the

Islands of the Caribbean. Bacchus is of Guyanese national origin which is also considered West

Indies national origin. (Bacchus Tr[1]. 8:10-17)

---

[1]References to:

- **"Bacchus Tr. __ "** refers to the transcript of plaintiff's deposition, excerpts of and
exhibits to ("**Bacchus Tr. Exh.__**") taken in this action on May 21, 2013 and August 14,
2013, which are attached as **Exhibit "2"** to Eke-Nweke Decl. submitted herewith.

2.    Bacchus was employed by defendant New York City Department of Education ("DOE") as a School Aide from December 1994 through March 11, 2011, when the DOE terminated her employment. (Plt. Aff. ¶4;  Roach Tr. Ex. 12; Eke-Nweke Decl. Exh. 3 ¶ 32)

---

- "**Bacchus Aff. ¶ __**" refers to the Affidavit of plaintiff attached as **Exhibit 1** to Declaration of Vincent I. Eke-Nweke submitted herewith.

- "**Cabranes Tr. __**" refers to the transcript of Myna Cabranes's deposition, excerpts of and exhibits to ("**Cabranes Tr. Exh.__**") taken in this action on June 12, 2013, which are attached as **Exhibit 4** to Eke-Nweke Decl. submitted herewith.

- "**Dickerson Tr. __**" refers to the transcript of Craig Dickerson's deposition, excerpts of and exhibits to ("**Dickerson Tr. Exh. 1**") taken in this action on June 12, 2013, which are attached as **Exhibit 5(a)** to Eke-Nweke Decl. submitted herewith.

- "**Menduina Tr. __**" refers to the transcript of Michelle Menduina's deposition, excerpts taken in this action on June 13, 2013, which are attached as **Exhibit 5(b)** to Eke-Nweke Decl. submitted herewith;

- "**McLaren Tr. __**" refers to the transcript of Candace McLaren's deposition, excerpts of and exhibits to ("**McLaren Tr. Exh.__**") taken in this action on June 20, 2013, which are attached as **Exhibit 5(c)** to Eke-Nweke Decl. submitted herewith.

- "**Lopez Tr. __**" refers to the transcript of Katarzyna Lopez's deposition, excerpts of and exhibits to ("**Lopez Tr. Exh.__**") taken in this action on June 20, 2013, which are attached as **Exhibit 5(d)** to Eke-Nweke Decl. submitted herewith.

- "**Roach Tr. __**" refers to the transcript of Robin Roach's deposition, excerpts of and exhibits to ("**Roach Tr. Exh.__**") taken in this action on June 13, 2013, which are attached as **Exhibit 6** to Eke-Nweke Decl. submitted herewith.

- "**Pepper Tr. __**" refers to the transcript of Renee Pepper's deposition, excerpts of and exhibits to ("**Pepper Tr. Exh.__**") taken in this action on June 14, 2013 and August 26, 2013, which are attached as **Exhibit 7** to Eke-Nweke Decl. submitted herewith.

- "**O'Connell Tr. __**" refers to the transcript of Colleen O'Connell's deposition, excerpts of and exhibits to ("**O'Connell Tr. Exh.__**") taken in this action on June 17 and September 3, 2013, which are attached as **Exhibit 8** to Eke-Nweke Decl. submitted herewith.

- "**Eke-Nweke Decl. Exh__**" refers to any of the other documents attached as "**Exhibit _**" to Declaration of Vincent I. Eke-Nweke submitted herewith.

2

3.      From on or about September 4, 2007 through March 11, 2011, Bacchus was assigned to the DOE public school known as PS/IS 295Q, District 29 ("PS 295") located at 222-14 Jamaica Avenue, Queens County, City and State of New York (Bacchus Tr. 9-10:20-1; Bachuss Aff. ¶ 6).

**B.      Bacchus Was A Member of The Unions**

4.      Bacchus was a member of the Unions and was in good standing, during her employment with the DOE. (Bacchus Aff. ¶ 5 )

5.      Since November 2008 through the present date, Robin Roach, Esq., ("Roach") has been the Assistant General Counsel for Defendant District Council 37 of the American Federation of County, Municipal Employees.(Roach Tr. 5:7-24).

6.      From July 2005 to the present, Myrna Cabranes has been employed by District Council 37 as an Assistant Director. (Cabranes Tr. 6:6-7, 8:1-7)

7.      American Federation of County, Municipal Employees is an international union that has other unions within it, including District Council 37. Whereas Local 372 is an affiliate of District Council 37. (Cabranes Tr. 7:9-25)

8.      At all times during Bacchus' employment at PS 295, Phyllis Wambser ("Wambser") was the Unions' Representative for all School Aides, including Bacchus, assigned to PS 295 and Local 372 was the collective bargaining entity. (Cabranes Tr. 22-23:8-24; Eke-Nweke Decl. Exh. 3 ¶ 31; Bacchus Aff. ¶ 17, ).

9.      Wambser retired from the Unions officially on November 7, 2011. However, Wambser had taken a vacation or terminal leave and ceased to report to work prior to November 4, 2011. (Roach Tr. 68-69; Eke-Nweke Decl. Exh. 11(a) #1)

3

10.     Upon Wambser's retirement, Craig Dickerson ("Dickerson") replaced Wambser as Bacchus Union representative. (Dickerson Tr. 10-12, 17).

11.     Dickerson and Bacchus met for the first time at Bacchus' Step 3 discharge grievance hearing on September 23, 2011. (Dickerson Tr. 15, 18; Bacchus Tr. 150; Bacchus Aff ¶35)

### C.     Relevant Terms Of The CBA In Effect Between The DOE And The Unions

12.     At all relevant times in this litigation there was a Collective Bargaining Agreement ("CBA") in effect between the DOE and the Unions which covered DOE's employment of Bacchus' as a School Aide. (Roach Tr. 9-11, Exh. 1; Eke-Nweke Decl. Exhs. 3 ¶ 31 and 12).

13.     The CBA provides as follows in pertinent parts:

a.     The [DOE] recognizes the Union as the exclusive bargaining representative of all regularly scheduled employees in the titles of School Aide.... CBA Art. 1.

b.     The [DOE] agrees to continue its policy of not discriminating against any employees on the basis of race, creed, color, national origin.... CBA Art. II.

c.     Upon request to the head of the school, a Union staff representative shall be permitted to meet with the employees in the unit during their non-working time, within the school, for the purpose of investigating complaints and grievances, under circumstances that will not interfere with school activities. A Union representative or shop steward shall be permitted to investigate grievances and complaints during working time provided such grievances require inspection of working conditions at the work location. CBA art. XX.

d.     A grievance, which has not been resolved by the Chancellor at Step 3, may then be appealed by the Union to the Grievance Panel within 20 school days of the receipt of the Step 3 decision. CBA Art. XX

e.     It is the policy of the [DOE] that discharge of an employee should be based on good and sufficient reason and that action should be taken by the supervisor having such authority only after he/she has given due consideration to the matter.

If an employee with more than the equivalent of one school term is discharged, .... Such employee will also, upon his/her request, be afforded an opportunity for prompt and careful review of the discharge in accordance with the provisions of the complaint and grievance procedure as stated in Article XX of this Agreement. CBA Art. XXI.

**D.** **Bacchus Was Discharged Based On Fabricated Allegation Of Verbal Abuse That She Called A Sixth Grade Student Fat Boy**

14.    On February 16, 2011, during a disciplinary conference convened by the Assistant Principal of PS 295, Defendant Renée Pepper ("Pepper") and attended by Pepper, Wambser and Bacchus, it was alleged by Pepper that Bacchus called AA, a sixth grade student, "fat boy". (Bacchus Tr. 99-103; Pepper Tr. 172-3, Exhs. 40 and 41).

15.    At the February 16, 2011, disciplinary conference, Pepper presented Bacchus and Wambser with copies of alleged statements by two sixth grade student witnesses JM and KR, alleged statement by AA and Bacchus' Log entry for February 4, 2011. Bacchus submitted a handwritten response prepared at the conference by Bacchus. (Pepper Tr. 169-170, 172-3, Exhs. 40-42, Roach Tr. Exhs 12-13; Bacchus Tr. 101, 105-6, Exh. Q; Eke-Nweke Decl. Exh. 10; Bacchus Aff. ¶¶ 32-33)

16.    On March 11, 2011, Bacchus was given a termination letter dated the same date notifying her that her employment with the DOE was terminated effective March 11, 2011. (Bacchus Tr. 105:19-106: 1-22, Exh. Q; Roach Tr. 82-3, Exh. 12. Pepper Tr. 172-3).

17.    The termination letter states as follows in relevant parts:

Employee was supervising a group of sixth grade students in the auditorium during recess portion of the lunch period. While inquiring about a possible name calling incident between two students, the employee called out to the student "Hey fat boy did you call him a name? (Roach Exh. 12 p. 1, Bacchus Tr. Exh. Q. p. 1)

Your log entry of an incident with a student [named JM] on February 4, 2011 only came to light in the course of investigation of this verbal abuse complaint. While you elected to call the parent, you failed to notify Administration at any time of the phone

5

call you made to the parent. Your behavior in calling the parent and failing to notify Administration was unprofessional and insubordinate (Roach Exh. 12 p. 4, Bacchus Tr. Exh. Q. p. 4).

**E.      The Unions Made No Attempt To Request Or Uncover CT's Statement, Other Students' Statements, Adults' Statements And/or Evidence Which Would Have Established That The Fat Boy Allegation Was A Fabrication And/or Corroborated Bacchus' Statement That She Did Not Call Student AA Fat Boy**

18.      Pepper testified that AA and CT were sitting close to each other and involved in a name calling altercation when Bacchus allegedly called AA fat boy. (Pepper Tr. 192-194)

19.      Pepper testified that the fat boy allegation was <u>first</u> reported to Pepper as an addendum to a letter written in Pepper's presence and at Pepper's direction by a sixth grade female student known as JM who along with another female student came to Pepper to tell Pepper things because Pepper has an open door. A copy of the letter in question is first page of Pepper Exhibit 40. (Pepper Tr. 158-160 Exh. 40 p.1)

20.      Pepper testified that she does not recall whether she asked JM to add the addendum stating "[a]gain today BK and I[] heard Ms. Baccus call A[] "Fat Boy" a couple of times." (Pepper Tr. 164-165, Exh 40 p.1)

21.      Pepper further testified as follows:

> Q.      Are you saying that the alleged victim did not report the incident until after it was reported by [JM]?
> **A.      Yes.** (Pepper Tr. 188:9-12)

22.      Pepper also testified that AA is a boy and that while in the auditorium, girls were segregated from boys. However, only girls gave alleged witness statements supporting the fat boy allegation. (Pepper Tr. 207)

6

23.    AA -- the alleged victim of the fat boy allegation -- did not report or make any complaint that Bacchus called him fat boy until after Pepper sought out AA and got him to write an alleged statement that Bacchus called him  fat boy. (Pepper Tr. 186-188, 192, Exh 40 p. 2).

24.    Pepper further testified as follows with respect to CT who was reportedly having a verbal altercation with AA when he was allegedly called fat boy:

> Q.    Did you ask [CT] if he or she overheard Ms. Bacchus call the alleged victim hey fat boy?
> **A.    I don't recall.**
>
> Q.    Did [CT] make any statement with respect to this incident?
> **A.    If it's not here, then no, I don't know.**
>
> Q.    So if the alleged victim told you that [CT] was close to him, why is it that a statement was not obtained from [CT]?
> **A.    I'm telling you that I don't know.          (Pepper Tr. 194)**

*i.*    ***The Unions Allowed Pepper And/or O'Connell To Suppress Exculpatory Statements, Evidence Or Witnesses***

25.    On July 1, 2013 (after the initial depositions of Pepper and O'Connell in June 2013), DOE defendants for the first time produced a copy of an alleged statement by CT dated February 3, 2011, and stating in relevant parts that: "all [Bacchus] said was set down and then she told A[A] to move but he didn't so she turned her head and didn't do nothing." (Pepper Tr. 248-251, Exh.49; O'Connell Tr. 155, 164-176).

26.    A copy of CT's statement was not provided to Bacchus nor to Wambser at the February 16, 2011, disciplinary conference nor was the statement produced or used for the underlying contract grievance proceedings. (Pepper Tr. 248-249; Bacchus Aff. ¶¶ 22, 32-36)

27.     In addition to CT's statement, on July 1, 2013, DOE defendants also produced for the first time, copies of certain students' statements or letters concerning the fat boy allegation. Such statements or letters corroborate Bacchus' defense that she did not call AA fat boy but the statements or letters were never produced during the underlying grievance proceedings. (Pepper Tr. 227-282, Exhs. 43, 44, 51, 52, 56; O'Connell Tr. 143-5; Bacchus Aff. ¶¶ 22, 32-36)

28.     Pepper also testified that she did not ask any SSA officer if the officer heard Bacchus call a student fat boy because the "SSA was way on the other side [of the auditorium]" or because she usually stands in the back of the auditorium. (Pepper Tr. 183-184)

29.     Pepper further testified that they don't question the SSA unless the SSA is involved in the investigation and that her investigation did not disclose that the SSA was involved. However, the recently disclosed student statement by EA evidences that SSA Parker witnessed the verbal altercation between AA and CT and that the SSA was present at the time Bacchus allegedly called AA fat boy. (Pepper Tr. 204, 260-261, Exh. 52; Bacchus Aff. ¶ 12)

30.     Pepper testified that she interviewed Ms. Arjoon about the fat boy allegation but that she did not obtain a statement from Ms. Arjoon because Ms. Arjoon said she didn't hear anything. (Pepper 181, 213).

31.     Donna Arjoon and Bacchus were standing at the same place at the time Bacchus allegedly called AA fat boy but the Unions did not attempt to interview Ms. Arjoon nor attempt to obtain a statement from her concerning whether she heard Bacchus call AA fat boy. (Bacchus Aff.¶¶ 13-15)

32.     Inside the auditorium where AA was when he was allegedly called fat boy, there were at least two surveillance cameras, approximately eight feet above the floor. The surveillance camera feed goes directly to the security desk and also to the principal's office. (Pepper Tr. 38-39, Bacchus Aff. ¶8, Bacchus Tr. 146).

33.     Despite repeated requests by Bacchus, the Unions failed to request access to the auditorium surveillance video footage for the recess period AA was allegedly called fat boy. (Bacchus Aff. 19-20; Bacchus Tr. 102, 145-148)

**F.      Bacchus Initiated A Grievance Proceeding Through The Unions Which Challenged Her Discharge But The Unions Relied Upon Pepper's Investigation To Prosecute The Grievance**

34.     Following Bacchus' discharge, by memorandum dated March 15, 2011 to Roach, Wambser requested Roach to consider Bacchus' discharge grievance for expedited arbitration. (Roach Tr. 54-55; Cabranes Tr. 82-83, Exh. 17)

35.     Roach approved Bacchus' discharge grievance for direct arbitration. (Roach Tr. 55:16-19, 57-58; Cabranes Tr. Exh. 19).

36.     Evidently, the DOE did not consent to direct arbitration of Bacchus' discharge grievance. Rather, by email dated April 6, 2011, Maurice Miller, Esq., of DOE, stated in part, that the discharge grievance "should proceed separately through the regular arbitration process." (Cabranes Tr. Exh. 20; Roach Tr. 58-59)

37.     By Wambser's letter dated April 15, 2011, the Unions filed a Step 2 discharge grievance on behalf of Bacchus challenging Bacchus' discharge as a violation of Article XXI of the CBA. (Cabranes Tr. 84, Exh. 18; Eke-Nweke Decl. Exh. 3 ¶16).

i.    *The Unions Relied Upon The Alleged Investigation Conducted By Pepper As Well*
*As Alleged Students' Statements Obtained By Pepper To Press Bacchus' May 11,*
*2011 And September 23, 2011 Grievance Hearings*

38.    On May 11, 2011, Wambser represented Bacchus at a Step 2 grievance hearing.
(Eke-Nweke Decl Exh 11(b)).

39.    At the May 11, 2011, grievance hearing, the Unions did not present any witness
statement or evidence or written material which corroborated Bacchus' version of events that she
did not call AA fat boy nor call any witness in Bacchus' defense.  Rather, the Unions relied upon
copies of the same students' statements (allegedly written by JM, AA and KR) which Pepper had
provided to Wambser and Bacchus at the February 16, 2011 disciplinary conference. ( Bacchus Tr.
142:9:11, 145-147,1-20, Exh. U; Plaintiff's Statement ¶ 26-27; Bacchus Aff.¶¶ 32, 34;).

40.    Apparently, the DOE did not respond to or render a decision on the Step 2 discharge
grievance.(Roach Tr. 59:20-23)

41.    By letter dated July 12, 2011, the Unions filed a Step 3 grievance on behalf of
Bacchus. (Eke-Nweke Decl. Exh. 11(c))

42.    On or about September 23, 2011, Bacchus and Wambser (as well as Dickerson who
attended as a non-participant observer) attended a Step 3 hearing on the discharge grievance.
(Dickerson Tr. 15, 18; Cabranes Tr. Exh. 22; Bacchus Tr. 150; Bacchus Aff. ¶35).

43.    At the Step 3 hearing, Bacchus submitted a favorable decision by the Unemployment
Insurance Appeal Board which found that Bacchus' alleged conduct did not rise to the level of
misconduct. (Eke-Nweke Decl. Exh. 11(e); Bacchus Aff. ¶ 35)

44.    The Union did not present any evidence on behalf of Bacchus at the Step 3 hearing.
Also, neither Wambser nor Mr. Dickerson submitted any written material, witness statement or

evidence which corroborated Bacchus' version of events nor call any witness in support of her defense. Rather, Wambser relied upon copies of the same students' statements, allegedly written by JM, AA and KR as well as copies of Bacchus' rebuttals dated February 16, 2011 and May 1, 2011, to represent Bacchus at the Step 3 hearing. (Dickerson Tr.18, 23-24; Cabranes Tr. 91;  Bacchus Tr. 142:9:11, 144-147,1-20, Exh. U; Plaintiff's Statement ¶¶26-27; Bacchus Aff.¶¶ 32, 36).

45.     By Grievance Decision dated October 21, 2011, Bacchus' Step 3 grievance was denied. (Cabranes Tr. 88, Exh. 22)

ii.     ***The Unions Did Not Conduct Their Own Investigation Into Bacchus' Grievance And They Prevented Bacchus From Seeking Witness Statements From Adults***

46.     The CBA permits the union representative to go to the school and investigate an issue that is grievable, ask adult witnesses for statements and interview adult witnesses. (Cabranes Tr. 36-37; Bacchus' Tr. 144, Roach Tr. Exh. 1; Plaintiff's Statement ¶ 13(c)).

47.     Cabranes, who was Wambser's supervisor at all relevant times did not do any investigation of Bacchus' grievance nor obtain any evidence, or ask anybody any questions concerning the viability of the grievance. Nor did Michelle Menduina, who was employed as Assistant Director for District Council 37 Schools Division and Dickerson's supervisor. (Cabranes Tr. 91:1-8, Menduina Tr. 6, 13, 15 )

48.     As a matter of practice, the Unions do not conduct investigations when they represent any of their members in a grievance. Rather the Unions rely on the investigation conducted by the principal or school Authority to represent their members in grievances or arbitration proceedings. **(Dickerson Tr. 36-40, 43-45).**

11

49. Dickerson further testified as follows:

A. **"Because we're not the ones that are conducting the investigation. We do not conduct investigations"** (Dickerson Tr. 38:13-15)

Q. Is it written anywhere that you do not conduct investigations?
A. **No,....** (Dickerson Tr. 38:25)

Q. So if the case eventually proceeds to arbitration, the arbitration is going to be conducted based on the investigation that the principal or school authority conducted?
    A.    **Yes.**    (Dickerson Tr. 39:13-17).

50. Wambser also repeatedly cautioned Bacchus not to seek witness statements from her co-workers or other adults. (Bacchus Tr. 66:9-21, 102; 144-145, Eke-Nweke Decl. Exh. 9 pp. 16-19)

51. Wambser repeatedly cautioned Bacchus not to involve the parents of any student involved in any allegation of misconduct brought against Bacchus nor seek witness statement from such parent. (Bacchus Tr. 56-57, 66:9-21, Eke-Nweke Decl. Exh. 9(a) pp. 18; Bacchus Aff. ¶ 18; Bacchus Tr. 102)

52. Roach testified that the Unions' long-term practice prohibits the Unions from contacting the parents of any student alleged to be the victim of a corporal punishment or verbal abuse by a union member. (Roach Tr. 22-23)

53. Cabranes testified that while the Unions do not interview parents of a child alleged to be a victim of corporal punishment nor ask such parents to appear for an interview, the Unions could ask the school Authority to obtain a statement from such parent if it would be relevant to the issue. (Cabranes Tr. 40-42).

54.     The Unions could request the school Authority to produce relevant surveillance video footage if surveillance cameras were located at the venue of an alleged misconduct by a union member. (Cabranes Tr. 43-44; Dickerson Tr. 41).

55.     The Unions do not conduct any investigation into any allegation that a union member was subjected to race discrimination in employment. (Cabranes Tr. 49-50)

56.     Donna Arjoon and Bacchus were standing at the same place at the time Bacchus allegedly called AA fat boy, however, despite repeated requests by Bacchus, the Unions did not attempt to interview Ms. Arjoon nor attempt to obtain a statement from her concerning whether she heard Bacchus call AA fat boy. (Bacchus Aff.¶¶ 13-18)

57.     SSA Parker stood in very close proximity to AA at the time Bacchus allegedly called AA fat boy, however, despite repeated requests by Bacchus, the Unions did not attempt to interview SSA Parker nor attempt to obtain a statement from her concerning whether she heard Bacchus call AA fat boy. (Bacchus Aff.¶¶ 12, 17-18)

58.     Inside the auditorium where AA was when he was allegedly called fat boy, there were four surveillance cameras, one camera located on each of the four walls of the auditorium, approximately eight feet above the floor. The surveillance camera feed goes directly to the security desk and also to the principal's office. (Pepper Tr. 38-39, Bacchus Aff. ¶8, Bacchus Tr. 146).

59.     Despite repeated requests by Bacchus, the Unions failed to request access to the auditorium surveillance video footage for the recess period AA was allegedly called fat boy. (Bacchus Aff. 19-20; Bacchus Tr. 102, 145-148)

    *iii.*     **_Roach Relied Upon The Alleged Investigation Conducted By Pepper To Decide That Bacchus' Grievance Should Not Proceed To A Step 4 Grievance Panel Or Arbitration_**

60.     As the Associate General Counsel for the Unions, Roach had the responsibility to review cases which had been processed through the lower steps of grievance procedure to determine whether those matters would proceed to arbitration. (Roach Tr. 5, 7)

61.     Bacchus concedes, solely for the purposes of this motion, that Wambser submitted Bacchus' grievance to Roach for a decision as to whether or not it should proceed to arbitration. (Roach Tr. 60-61, Cabranes Tr. Exh 22; Eke-Nweke Decl. Exh. 11(a) ¶8)

62.     Bacchus concedes, solely for the purposes of this motion, that Roach determined that the grievance should not proceed to arbitration. (Roach Tr. 63-66, Cabranes Tr. Exh. 23; Eke-Nweke Decl. 11(a) ¶8)

63.     Roach relied upon the same students' statements allegedly obtained by Pepper from JM, AA and KR, to determine that Bacchus' grievance should not proceed to arbitration. (Roach Tr. 64, 73-74; Plaintiff's Statement ¶¶ 39, 44; Eke-Nweke Decl. Exh. 11(a) ¶8).

64.     Bacchus further concedes solely for the purposes of this motion, that in making the determination that the grievance should not proceed to arbitration, Roach reviewed the handwritten statement Bacchus made at the February 16, 2011 disciplinary conference as well as the statement dated May 1, 2011, Bacchus submitted at the May 11, 2011, Step 2 grievance hearing. (Roach Tr. 83-85, Exhs. 13 and 14)

65.     In making the determination that the grievance should not proceed to arbitration, Roach did not ask any union representative to request the school Administration to interview or obtain a statement from an adult witness such as Ms. Arjoon or SSA Parker, nor request for access to any relevant surveillance video. (Road Tr. 84-86, 91, 100-102)

66.     In making a determination as to whether or not a given grievance should proceed to arbitration, Roach had the responsibility, if she thinks it's warranted, to ask a union rep to conduct further investigation into the grievance. (Roach Tr. 92)

67.     The Unions claim the document marked Roach Exhibit 11 was the School Lunch Memorandum, however Roach Exhibit 11 was not one of the itemized documents the Unions claim were in the file Roach reviewed in making her determination that Bacchus' discharge grievance should not proceed to arbitration. (Eke-Nweke Decl. Exh. 11(a) ¶¶7-8)

68.     Bacchus did not violate the school Lunch Schedule Memorandum. (Bacchus Tr 104-105, Bacchus Aff. 26-27, Roach Tr. Exh. 11).

**G.     THE UNIONS DID NOT CONDUCT THEIR OWN INVESTIGATION INTO BACCHUS' SUSPENSION GRIEVANCE AND ARBITRATION NOR INVESTIGATE OTHER ALLEGATIONS OF MISCONDUCT AGAINST BACCHUS**

69.     The Unions did not conduct their own investigation of Bacchus' suspension grievance and arbitration. The Union relied on the alleged evidence or students' statements obtained by the Administration to represent Bacchus at the grievance hearings and arbitration. (Cabranes Tr. 46-50, Exhs. 7-10; Roach Tr. 50-52; Bacchus. Aff. ¶¶ 40-54)

70.     Bacchus stated several times in the rebuttals she submitted to the Administration and to Wambser that the Principal was overheard several times stating that she had a problem with West

Indian women and that the allegations of corporal punishment, verbal abuse or misconduct were being fabricated so that to create a pretext for her discharge so that Lopez would be given her position. (Cabranes Tr. Exhs. 2, 4)

71.   Although Bacchus clearly articulated the grounds for her suspension grievance, the Unions argued, with out any support, that the students made up the allegations against Bacchus because they overheard Bacchus say she didn't like their teacher. (Cabranes Tr. 54-55, 58, Exhs. 7-8)

72.   Also, although Bacchus was allegedly suspended as a result of the hair pulling allegation involving the student known as ES, the Unions argued without any support that the suspension was based upon corporal punishment charges brought forth by six students. (Cabranes Tr. 54-55, Exh. 3, 7, 8)

73.   With respect to the allegations for which Bacchus was issued disciplinary letters to file or warning letters, Unions failed to conduct their own investigation. Rather, Wambser prevented Bacchus from soliciting witness statements from her co-workers. Wambser did not attempt to obtain statements from parents of the students involved in the allegations. The Unions relied upon the alleged investigation conducted by the Administration to represent Bacchus with respect to each allegation. (Bacchus ¶¶ 56-66, 68; Eke-Nweke Aff. Exh. 9(a) pp. 17-21).

74.   Throughout her approximately 17 year tenure as a DOE employee, Bacchus was never subjected to any disciplinary actions, adverse rating or allegations of corporal punishment or verbal abuse until on or about February 2, 2010, **for allegations of misconduct which allegedly occurred in November 2009, the same month Lopez was laid-off by DOE**. (Pepper Tr 82, Exh. 12; McLaren Tr. 44; Bacchus Aff. ¶ 57).

75.     The DOE laid-off Lopez and terminated her employment with DOE effective November 16, 2009. By letter dated September 22, 2009, DOE notified Lopez about the impending lay-off. By letter dated October 2, 2009, DOE, among other things, notified Lopez that her employment with the DOE will be terminated effective October 16, 2009. (Lopez Tr. 30-33, Exhs. 1-3).

Dated:      New York, New York
            April 25 , 2014

                              Respectfully submitted,

                              LAW OFFICE OF VINCENT I. EKE-NWEKE, P.C.

                              By:_____
                                  Vincent I. Eke-Nweke (VE 5282)
                                  Attorney for Plaintiff MERLENE BACCHUS
                                  498 Atlantic Avenue
                                  Brooklyn, New York 11217
                                  (718) 852-8300

17